You may proceed. Thank you, Your Honor, and may it please the Court, I'm Randolph Barnhouse and I'm here today on behalf of the Confederated Tribes and Bands of the Yakama Nation. This case involves both the General Allotment Act and the Yakama Treaty of 1855. The General Allotment Act prohibits taxation that can result in an encumbrance on or forfeiture of an allotment. That requirement focuses on the encumbrance of title on the allotted lands and not on the nature of the taxable event. If an encumbrance or forfeiture of an Indian allotment can result from the tax, that tax cannot be imposed on Indian allotted lands. This is an excise tax case, a tax imposed upon moving manufactured tobacco products into the market. The incident of the tax is on the transfer of the product, movement out of bond, or importation. It's not an income tax. It does not involve income or capital gains. The excise tax scheme allows seizure and forfeiture of Yakama allotted lands, even if the landowner is not responsible for the tax at issue. Applying the General Allotment Act, as this Court and the Supreme Court has done in Kapoman, makes clear that this tax, which allows seizure of allotted lands by the government from third-party non-taxpayers, cannot be applied on Yakama allotted lands. The Internal Revenue Code provides for the cigarette excise tax in subchapter E, chapter 52, 26 U.S.C. section 5701. 26 U.S.C. subtitle G provides for penalties and forfeitures. Section 5761 is civil penalties, 5762 criminal penalties, 5763 provides for forfeitures. Subsection A is forfeitures of cigarette papers and tubes. B, personal property of those acting with intent to defraud. C, real and personal property of illicit operators. It's subsection D, entitled General, that is the issue here. That subsection says, all property intended for use in violating the provisions of this chapter, the tobacco tax code, or regulations there under, or which has been so used, shall be forfeited to the United States, provided in section 7302. Intent is not an issue. Ownership is not an issue. Shall be forfeited is the statutory requirement. The forfeiture occurs as provided in 26 U.S.C. section 7302. That section also says it shall be unlawful to have or possess property intended for use, or which has been so used, in violating the code or regulations. And no property rights shall exist in such property. The forfeiture... You're going ahead, obviously, with the merits, but I had some procedural questions first. Certainly, Your Honor. Here on behalf of the Yakima tribe. Yes, Your Honor. So what is the source of a sovereign interest in preventing taxation of an individual member? In other words, the tribe versus the individual member. And I'm asking this in the context of the Anti-Injunction Act. Certainly, Your Honor. The sovereign interest is in protecting the allotted lands held in trust for individual allottees of the Yakima Nation, members of the Yakima Nation. The Anti-Injunction Act, however, wouldn't apply to the Yakima Nation, both because it's not a person under the Act, and because of the Supreme Court's ruling in South Carolina versus Reagan, stating if they have no other option, which here the Yakima Nation would not have, to protect these allotted lands. Well, that, of course, assumes the rights. If you're looking at the Treaty of 1855, would that be the source of the rights? The source of the rights are both the General Allotment Act and the Treaty of 1855. Specifically, Section, Article 6, which talks about the allotment, the possible allotment of lands with reference to the Omaha Treaty, which, just like in the General Allotment Act, says that no encumbrance can be placed on these lands. But what is it, it seemed to me that the remedy here is the taxpayers' refund suit. Isn't that a remedy? It is a remedy, but it's not a remedy available to my client. Really? I mean, that's, it doesn't seem to me that you have, that the interests are so inextricably intertwined here. I mean, you have the individual taxpayers who, if assessed, have the right to bring the individual refund suit, correct? Yes, or to oppose a suit brought by the United States, which is, in fact, the case here. But isn't really the tribe's status completely derivative of those individuals in trying to avoid the tax on this particular, I'll call it endeavor, I don't want to judge one way or the other, but you know, the cigarette selling. Not at all, Your Honor. The tribe's interest is in making sure that allotted lands that belong to its forfeited in violation of both the Treaty of 1855 and the General Allotment Act. If one allotted member loses his allotted lands, that then can serve and would serve as precedent for other allotment holders. How are they going to lose their lands? Under the forfeiture provisions of the tobacco excise tax. That's exactly the problem here. If they don't pay the tax, the land can get forfeited, that's... That's exactly right, Your Honor. If they don't pay their tax, they can, well, they have a choice to pay their tax and have a refund suit, correct? And then... If they had the money, I mean, it's, we're talking 60 million, 23 million dollars plus penalty and interest here. Right, but this is not a mom-and-pop shop operation you're talking about. It is a mom-and-pop shop operation, Your Honor. It's amazing. And where do you get the tax of that magnitude off the mom-and-pop operation? Because that doesn't make sense. The taxes, what it takes to produce a package of cigarettes is pennies, and they sell for so much because of the federal tax on it, the state tax on it, the escrow tax on it. Pardon me? When you sell things, what do you get? Revenue, right? Right, but the Yakima... The excise tax is imposed on a revenue. But the Yakima Nation doesn't get that, and there's no guarantee that this taxpayer, who's now deceased... Of course, the Yakima Nation doesn't get it because it's an individual taxpayer claim. Right, and the Yakima Nation could never bring that claim. So the Yakima Nation, that's exactly the holding South Carolina of Eureka. Land, aren't they? No, Your Honor. The land belongs to the federal government. It's held in trust for Mr. Delbert Wheeler, the allotment holder, not the Yakima Nation. Right. But the Yakima Nation, as a sovereign government, has an interest to ensure that its members' holdings of the lands, the treaty lands that they retained in negotiation of the treaty, that those lands aren't taken from them. So they have a huge interest in this case that they have no other avenue to protect except this lawsuit, as Judge Peterson correctly held. She didn't even get to the second question of whether the Yakima Nation is a person. No, she might not have, but we're going to get to both of them. Excellent. Because you can't get to the third thing you're or the, I'm sorry, the subject matter jurisdiction question. But here, the Yakima Nation interest is distinct from the taxpayers. It's an interest in the land that it bargained for in the Treaty of 1855. Land that subsequently, some of that land was subsequently allotted to individual members, but it's still reservation lands. Application of the reservation, that their sovereign interests over these lands. And any time there's a danger that they could lose these trust lands, they have a very direct interest in protecting that. And that's different from the individual allotment holder's interest. So now, would you address the tribe issue in terms of tribe as a person? Well, the tribe, the person does not include the sovereign, Your Honor, and that's the situation here. This is a sovereign Indian nation. It has a treaty with the federal government approved by Congress, signed by the president. It's recognized by the federal government as a sovereign nation. And there's no definition of person in the Anti-Injunction Act, which would encompass the tribe. Would the court have to invent something like the slaughterhouse case to define this as a person? To define the, well, the nation. Well, the bishop tribe argued that it was a person. It argued that it was a person in an action against Inyo County. It went all the way to the Supreme Court, and in that case the Supreme Court held that no, tribes are not persons. So there is precedent, consistent precedent, holding that tribes are not persons in other contexts, and that's applicable here as well. It's a sovereign nation here today to protect its sovereign tribal lands. And what about, how do you then square that with the Chickasaw case? Well, the Chickasaw case turned entirely on the IGRA and language in IGRA, the Indian Gaming Regulatory Act, where Congress had taken steps to make sure that the tax was payable. None of that is present here. This is a tobacco excise tax case that requires that the land shall be forfeited. There's nothing the tribe can do about that, not even with any intent. If King Mountain doesn't pay the tax, then the land shall be forfeited under the tobacco escrow statutes, or I'm sorry, the tobacco tax statutes. That's the key here, and that's exactly what Capone held, and that's exactly, that has been recognized by the government itself. In page 21 of its response brief, when it's talking about the proceedings below, which were a bit complicated because the taxpayer and the owner of the taxpayer and the tribe were all three plaintiffs, and Judge Peterson dismissed the taxpayer and the owner of the taxpayer out of the case because of the Anti-Injunction Act. Then the accommodation moved for partial summary judgment, and as the U.S. describes in its response brief here, the government countered that King Mountain was not exempt under the General Allotment Act. The government argued, and this is a quote, that the standard for exemption under the General Allotment Act is whether the tax, if assessed and unpaid, would give rise to a lien against the allotted land at issue. It would here. There's no doubt about that. The government went on at page 61 to say, the purpose of the General Allotment Act, as interpreted by Capone, is to preserve from encumbrance Indian trust property and income directly derived therefrom. We agree with that. The parties are in agreement. Here, the very acted issue says that the land shall be forfeited, even if it's an innocent owner, if the land is so used for violation. That was my question. If this had been, this manufacture, well, this operation is owned by the tribe? No, it's not, Your Honor. It's organized by the tribe? What is the relationship? The relationship of the tribe to this is the same as the relationship of the state of Washington to Microsoft. The tribe has formed it as a corporation. It operates as a corporation on Yakima lands. Its owner, who's since passed, was a Yakima Indian, owned it entirely, and it operates on his allotted lands. So the interest of the tribe here is not over the operations of King Mountain, necessarily, but on the interest in protecting these allotted lands. The processing that takes place there doesn't matter. Judge Peterson, there were two issues here, and there are two issues. The directly derived issue, I didn't plan to argue much, it's covered in the briefs, but the fact is this product is derived from tobacco. Some of it is done no more than processed, dried, and placed in a bag. But Judge Peterson ruled that any manufacturing, without specifying what it would be, destroys the General Allotment Act protections. That ignores the holding in Kopoman, which says the issue is not necessary in every case. In Kopoman, it was an income tax case. Dillon, income tax. Hoptowit, it was not a General Allotment Act case. Ramsey was not a General Allotment Act case. In Kopoman, the issue was what is the encumbrance and what is protecting the allotment from encumbrance. And as this court held in Anderson, the purpose here is to protect the land, income or the income. We're not talking about the income, necessarily, at this point, just protecting the land. So processing doesn't matter. The fact that it was a corporation that's not owned or anyway controlled by it also doesn't matter, Your Honor, because the excise tobacco tax, the tobacco tax says, shall be forfeited even if it's an innocent landowner, if it so is. So that if this were a lease, if the tribe did lease this to a company that was manufacturing cigarettes, it would still be subject, the land would still be subject to forfeiture, and you would have the same argument? Exactly, Your Honor, exactly. And where do you think the dividing line is between a product that may originate on the land but is not the product that is ultimately sold? That's a very good factual question, and we unfortunately didn't get to that. What is it in the process? Is it growing and cutting? It can't be that because in Cree they cut the lumber. Is it the drying? Is it the threshing? Is it the blending? And at what point does it transfer from something that's not directly? What are they getting? The excise tax is on the cigarettes, correct? The excise is on the tobacco products, and it is assessed at the time it's moved, transportation. I want to touch briefly on the treaty issue. What is tobacco product? It can be some of its tobacco products sold for traditional purposes. It's almost raw tobacco. Some of it is cigarettes, and some of it is snuff, chewing tobacco. In your view, there's no difference among those three categories? No, they could all be very different. And if we had a factual base to determine it, it may be that chewing tobacco or pipe tobacco that's not sold in package might be treated differently than cigarettes. But to put an absolute bar on any manufacturing isn't required by the law, and in fact, really is opposite to the General Allotment Act. I have already touched briefly on Article VI, which tracks the General Allotment Act. I would also say that in Koppelman, the U.S. Supreme Court looked also to the Quinault Treaty, which said exclusive use. Those two words in Koppelman were sufficient when combined with the General Allotment Act to have the Court apply treaty arguments. Exclusive use and benefit are in the treaty, the Yakima Treaty, as is free access. The Ramsey case, the Court in Ramsey, and Judge McKeon was on the panel, looked at in common with language, not the free access language, and we'd urge that the Court should have done so here. In the manufacturing process, you have other things. You have addition of paper. You have transportation. You have companies performing services. Now, why isn't that manufacturing process, doesn't that convert this product into a manufactured product? It might at some point, but the problem is at what point? Certainly, Congress never intended for Indians only to grow and be agriculturally based and have others benefit from all processing. And in Cree, the logs were cut down. There was some physical labor there that was not sufficient. So the manufacturing process could do it, but it shouldn't be an absolute bar. I'd like to reserve the rest of my time for rebuttal. Thank you. Thank you. Good morning, and may it please the Court. Patrick Erta for the United States. Your Honors, the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act do apply in this case. And even if they didn't, the General Allotment Act nor the treaty, neither the General Allotment Act nor the treaty from the Yakima provide an exemption from the generally applicable tax here. I'd like to start with the Anti-Injunction Act. It appears from my opposing counsel, both in brief and in argument, that they can see that the relief being sought by the Yakima Nation is the type of relief that would normally come within the scope of the Anti-Injunction Act and the tax exception to the Declaratory Judgment Act. So the question is whether South Carolina v. Regan applies, and as the Court inquired, whether the sovereign here can be treated as a person. As to South Carolina, this case is on all fours with the Sixth Circuit's recent decision in RYO, in which there were three separate litigants, but they all had interests that were inextricably intertwined. And although opposing counsel asserts that the Yakima Nation's interest is different, it actually is no different from the litigants here because they're all raising the same issues. The issue is whether the Treaty of 1855 and the General Allotment Act apply. Because there are really one set of issues here, this does not present the same case as in South Carolina, where South Carolina had constitutional issues that another bondholder, who would be the litigant at issue, would have no incentive to bring up. Here you have someone, Mr. Wheeler and Mr. Wheeler's company, which is the actual taxpayer, that would raise these issues. So you don't have the South Carolina problem. Instead, this would create a new problem, which is it would be an end run around the Anti-Injunction Act because it would allow Yakima Nation to fully litigate this case before the assessment and collection of the tax, which is, of course, what the Anti-Injunction Act is supposed to stop. And the taxpayer at issue, King Mountain, would have no incentive to actually bring the refund suit, which is exactly what Congress – it's the course that Congress has designed. Now, turning to the second question under – Let me just go back, though, to Mr. Barnhouse's argument because he's saying that there is something more global with the Yakima Nation so that it's not trying to preserve the allotment land on which King Mountain happens to have its operation, but that the tribe has a broader interest in making sure that tribal lands are not inappropriately forfeited and that that is different from the taxpayer's interest. I don't think there's any difference, Judge, because, again, what the taxpayer argued – and remember, I think you made the point that their interest was derivative. That's correct. If you look at the complaint, and that's ER 248 to 89 and 193 to 247, the only interest asserted by the Yakima is that it's injured by its members being taxed and the associated threat to tribal self-government and economic well-being. It is a derivative claim. And you can also see that because the claims being brought, and the complaint was very detailed on this, had to do with the Treaty of 1855 and the General Allotment Act. So, again, the South Carolina exception, which this Court has said must be narrowly construed, and that's consistent with all of its sister circuits, the South Carolina exception is for a very specific circumstance where South Carolina had a Tenth Amendment interest in raising money and no other litigant that could bring a suit to challenge the action would have an incentive to challenge that portion of it. That was only South Carolina's, and they had no avenue. That's not what's happening here. Yakima Nation's arguments and interests line up and are derivative of King Mountain's. Now, turning to the question of whether the Yakima Nation is a person for Anti-Injunction Act purposes, I think it's helpful, first of all, to start off by wondering what the Anti-Injunction Act is. It's a part of the Internal Revenue Code. So Mr. Barnhouse wasn't quite right in saying that there is no definition. The Internal Revenue Code supplies a definition, as we have in our brief. It's under 7701A1, and it uses inclusive language, as the Tenth Circuit pointed out in Chickasaw. And that makes sense because the Anti-Injunction Act first came into being in 1867, and the word person didn't apply at all. It was all suits to restrain the assessment and collection of taxes. It was very broad. The word person came in more specifically in 1967 because language had been added to allow actions for wrongful levies. So in order to line that up, in order to line up the Anti-Injunction Act language with the wrongful levy language, person was added. But the Supreme Court has said in Bob Jones, this is in Note 6, that was declaratory, not innovative. So the Anti-Injunction Act is just as broad as it always has been, which is to stop the restraint on assessments and collections. Of course, the Supreme Court has repeatedly said that sovereigns, such as states and Indian tribes, can be persons in some contexts and are not in other contexts. In the Internal Revenue Code, I point out two cases, Ohio v. Halvering, 292 U.S. 360, and a case called Sims, 359 U.S. 112, where states or other sovereigns have been held to be persons for purposes of the Internal Revenue Laws. So too here with the Yakima Nation. It's a sovereign but given the broad and inclusive meaning of persons under the Internal Revenue Code and here in the context of the Anti-Injunction Act and given the reasons for the Anti-Injunction Act, persons should mean the Yakima Nation. Now, if this court were to reach the merits, and of course it would have to get passed through the Anti-Injunction Act to reach the merits, we contend that the district court got it right. The General Allotment Act... Wait, just before you do that, is there any other case other than Chickasaw where the person issue is directly addressed? In terms of tribal sovereignty? Yes. Not that I was able to find, but I think that the state sovereignty is a good analog. I'd also note that the one Supreme Court case that was particularly relied upon by the Yakima Nation was a case called Vermont. That case came out in 2001. Chickasaw Nation made its way to the Supreme Court itself. The Supreme Court certainly didn't reverse the Tenth Circuit on its lengthy exegesis on the tribe being a person. If the Supreme Court had announced some new view of person, then it certainly could have done so consistently. So I think that that gives further credence to our argument that the Tenth Circuit got it right and it's fully consistent with Supreme Court precedent on treating sovereigns as persons for purposes of the internal revenue laws. Turning to the merits, unless there are any more questions on the Anti-Injunction Act. There is not. Okay, great. Turning to the merits, the General Allotment Act under Squire v. Koppelman, I'm not sure how I'm saying that, is one that is geared to the income tax route. So remember, Indians and Indian tribal corporations, which is the taxpayer here, are subject to generally applicable tax except where there's an exemption. Here the Squire v. Koppelman reading of the General Allotment Act says the only exemption has to do with tribal property or income derived therefrom. This is an excise tax, which isn't on tribal property or income derived therefrom. So we believe that the excise tax is totally outside that, the General Allotment Act framework. If the tax isn't paid, what happens? Well, that's a very good question, Judge. There is no lien or levy on land held in trust for an Indian tribal member. So this is made clear in Treasury Regulation. So that's 26 CFR Section 301.6321-1. Solely for purposes of Section 6321 and 6331, which are the lien and levy provisions, any interest in restricted land held in trust by the United States for an individual non-competent Indian and not for a tribe shall not be deemed to be property or a right to property belonging to such Indian. So there won't be a lien or a levy. In terms of the forfeiture argument, which is a new argument on appeal and which was never made in the district court, we don't believe that forfeiture would apply either. In the original brief, the Yakama Nation concentrated on subsection C, so I think that's 5763C, which says that property, real property, can be forfeited if there's an illicit manufacturer, but it only applies to the taxpayers or the illicit manufacturer's right, title, and interest. The illicit manufacturer here is a tribal corporation and is not the allottee. So there are two different concepts. There's Delbert Wheeler, who's the allottee, and then there's the taxpayer, the tribal corporation. So under 5763C, forfeiture would only apply to the right, title, and interest that King Mountain has. They don't have any right, title, or interest in the allottee's land. And of course, as I just said, the allottee, there is no lien or levy on his land. Let me just stop right there. Could that mean if there's no can't levy onto tribal land, even if it's not still held by the tribe but has been spun out to an individual allottee, could you levy on physical plant but not real property? I think that you could levy on his plant, yeah. I think you could levy on King Mountain's plant, but what the General Allotment Act is concerned about is just the real property. Okay, so let's just play this out. The government wants these excise taxes. We've talked about whether, of course, the allottee or the allottee's heirs could pay the taxes, go in, and have a tax refund suit. Let's say they don't do that. They just don't pay. So then what does the government do? Well, I think that the government could have a lien and levy consistent with its normal procedures under buildings and personal property. One thing that they can't get is the property held in trust. Obviously, this wasn't really discussed in the district court at all, and the forfeiture provision, which is now heavily relied upon by the Yakima Nation, 5763D, was not discussed in the opening brief except in passing. Now there's a great deal of emphasis and argument on that provision, but there are no cases that indicate that 5763D can be used to forfeit real property held in trust considering that the Treasury regulations explicitly say there are no lien or levy. So then if they don't pay the tax and you can't levy except upon personal or other property, then the government would need to sue King Mountain to recover the tax? Yes, in fact, we have sued King Mountain. They want a preemptive declaratory judgment that you can't do that. Right. So those are the two lawsuits. Now we still have that lawsuit out there, right? Yes, that's right. The individual and the King Mountain Corporation? That's right. Okay. And the individual is not part of this lawsuit anymore? Right, and they didn't appeal the decision that the Anti-Injunction Act put a stop to their lawsuit. Right. That's right. Okay, so if it were determined that this case cannot be brought, the declaratory judgment, et cetera, is improper by the tribe, then the government is left to its regular lawsuit? That's right. We've reduced the assessments to judgment. It's now an appeal to this court. Let's just say now that we do have jurisdiction. Okay. And so let's say first that we have jurisdiction, but we disagree with the Yakima's interpretation about directly derived from or income versus excise tax. So we disagree with that. Then you still have your lawsuit, correct? That's right. You just go back to the lawsuit? We just go back to the other lawsuit. But let's say we agree with him on behalf of the Yakima tribe. Then what happens? If you agree, I guess that it would probably, yeah, I think it would pretty much resolve the other lawsuit. Yeah. Unless there were factual issues about, like, which categories of product or derivatives fell within which box. I think that that's right. But I'd just like to hit on that a little bit, because, again, I want to return to the General Allotment Act, because the General Allotment Act is really geared to the income tax realm. So the Yakima Nation is correct on that. But that's a problem for the Yakima Nation, because unless there's an exemption, a generally applicable tax is owing. So the excise tax is not an income tax. They're right. The excise tax is on the privilege of doing something. So every time you do something, whether it's roll your own tobacco, snuff, or cigarettes, you have to pay this excise tax. The General Allotment Act has nothing to do with that. The General Allotment Act, which really goes to protect property or income derived therefrom, doesn't connect with the excise tax at all. So the General Allotment Act is not that exemption, nor does the Treaty of 1855 supply such an exemption. Just as a general interpretive matter, treaty provisions can't be stitched together to create an exemption that's not clearly expressed. This Court's case in Kerman is totally clear on that. And none of the three provisions relied upon supply an express exemption that would apply to this type of tax here. So Article 2, this Court has said in hop to it, is pretty much coterminous with the General Allotment Act. So, again, it protects land and income derived directly therefrom. So, again, that doesn't supply an exemption that would fit here. Article 3 in Ramsey, this Court has said that the right of free access language to reservation roads is just that broad. So it doesn't apply to the excise tax realm. And then, finally, Article 6 deals with non-alienability, and Dillon establishes that has nothing to do with taxation. So there are no express exemptions, and really there's nothing that would preclude doing exactly what the district court did here, which is uphold this excise tax. I will note that a lot of the discussion by the district court and the brief, both briefs, discussed the excise tax and analogized it to an income tax setting. As we laid out in our brief, we think this is an excise tax and totally different. But even by analogy to the income tax setting, we think that this is more like reinvestment income. Again, we don't think that this is the proper framework. These exemptions are geared to income taxes. This is an excise tax, totally different. No exemption for the excise tax. But even if you wanted to try to bridge the gap, these are the type of products that wouldn't even be protected under an income tax type analysis. If there are no further questions, thank you. Thank you. You have some rebuttal time. Judith. First off, I'd like to say that we do not concede that the type of relief is the same that's being sought here, as I hope I made clear opening up. As to the question on is there another case that deals with Indian tribe as a person, in reference to Judge Goodwin's, there's the Inyo County versus Paiute Shoshone's 538 U.S. 701. On the Igritt case, as Justice O'Connor noted, the court today holds that 25 U.S.C. 2719D clearly and unambiguously fails to give Indian nations the exemption from federal wagering excise and related occupational taxes. That's the gaming, that's the Chickasaw decision, Judge McKeon, that you asked about. The General Allotment Act is not focused on income. That's just not correct. The General Allotment Act is focused on the title to allotted lands, and so that's the key here is the statute, especially 7302, where innocent forfeiture is permitted by the courts, specifically goes to whether that shall forfeit. In 7302's, the no property interest provisions are just like in Kapoman, that the fact that if the tax were imposed and if the U.S. proceeded, they don't have to do that in Kapoman. They didn't have to try to take the allotment. It was enough that they could to allow the U.S. Supreme Court to say that the tax could not be opposed on those allottees. Both Articles 2 and 3 do contain exemptive language. In fact, in Ramsey, the question was not the free access claim, which the Ramsey panel said free access is exemptive language. The Ramsey case was the use in common with other citizens. They based it on that language as the exemptive language. The court specifically said free access is exemptive. Here, the access isn't free. Although the tax is on cigarettes, the incident of the tax, it does not become co-ed, as it were, until it's moved, actually physically moved to the public highways. That's transportation. Transportation was the key in Cree, which is a state court case. It was the key in Smiskin, which was a federal prosecution, but based on state law. And in McKenna, it was just simply a trade case with no transportation. Here you have transportation. The minute the product is taken to market to public highways, that's when you can make cigarettes all day long and leave them sitting in your factory or bonded warehouse, and they're never taxed. The tax only kicks in when they're moved. Thank you very much. Thank you. Thank you both for your arguments. Also, the extensive briefing, it's a very, very interesting case. The case of Confederated Tribes versus the Alcohol and Tobacco Bureau is submitted, and we're adjourned for the day. Thank you.
judges: Goodwin, Schroeder, McKeown